We'll proceed to our second case, which is number 12-1730, EQT Gathering Equity, LLC v. Fountain Place, LLC. Mr. Partain, we'll be glad to hear from you whenever you're ready, sir. I'm George Partain. I'm from Logan County, West Virginia, and I represent Fountain Place, LLC, who owns a mall in Logan County. The appeals that I'm presenting to you today relate to two separate gas pipelines that are on this mall property that was purchased by Fountain Place, LLC on February 8, 2001. One's called the BR-886 pipeline, which runs along the top of the mountain, and then there is the DC-4 pipeline, which runs along the side of the mountain. They're totally separate issues. I'd like to try to get to the dispositive issues related to the BR-886 pipeline. I think the best way to do that would be to tell you what our contentions were. We had filed a counterclaim for a mandatory injunction compelling EQT to bury the pipeline under our two roads we had on the property. The facts related to that, which we presented to the court. The court issued a ruling stating that there was no issue of fact and awarded summary judgment to them. This was after about a year or so after this action started. Was that specifically with regard to the haul road issue? Yes. What we contended here was that there were two roads, which were haul roads, on the property. Basically, the evidence that we presented to the circuit court or the district court was that sometime after we purchased the property in 2001, when we bought it, the pipeline was buried under these two roads. If you look at there, there's an affidavit that was by Hiram Priest and an affidavit by Eddie Hurley. These are, I think, at 368, 369, and 370 in the appendix. They state that there was a fire that occurred after we purchased the property, affected that pipeline. Thereafter, they put in a new pipeline. The original pipeline was an eight-inch pipeline, according to the affidavit. Then, they put in a new one, ran it a different way, a six-inch pipeline. Now, it crosses over top of these two roads. Didn't the district court grant summary judgment because the court found that there was no issue of fact and that these were not haul roads? One of the findings that it made, right. That's correct. How do you contend that we should define haul roads? Well, I don't think that you can, Your Honor. I think that that's a jury issue, and that's the point. If you look at the affidavits of Billy Hunt, of Hiram Priest, and Eddie, they all refer to them as haul roads. Then, I will state to you that when we were briefing the issue, EQT, in their own brief, I think it's at 188 in the appendix, admitted there was an issue of fact as to whether or not they're haul roads. So, there is no legal definition of haul roads anywhere in West Virginia in coal mining law or timber law or anywhere that you're aware of? Well, this lease was executed on April 13, 1944. There may be some laws later on that were addressing haul roads or something, and I'm not aware of it. But I don't think there's any definition you can look at. It's just what, to me, a haul road is simply something that you can haul something over. It's not a highway or anything else, and they're all over the mountains down there. Okay. I understand. But let me state this. The crux of the case, if you'll look, the judge found that the pipeline had never been moved after we purchased the property. And that's error because the own affidavit of EQT that was filed, and I believe it's at 161 in the appendix, and I want to read that to you. This is in their affidavit by Charles Hopkins, their employee. It's number four. It says the pipeline, now known as BR-886 pipeline, previously crossed upon the surface of the subject tract at a location different than where it is located today. Well, I think the crux of this matter were the judges deciding, yeah, if they moved it after you purchased it, they changed the status quo, but they didn't do that. And he made that finding. And that's based on the Quintain case, correct, to look to the status quo and who changed the status quo to determine who pays, basically. Is that right, based on Quintain? That's what I think the judge was looking at in the case. He was looking to see that. And in Quintain, didn't the court there look first to the actual language in the contract? And there, the contract was silent as to cost. Go ahead. There was no contract in the Quintain case. The judge made that. He said there was a breach of contract in that. I pointed out to him that we had two separate deeds in Quintain. Each of them got their rights by these deeds. And when they got their deeds, there was a certain setup as far as the pipelines went. Well, the coal company was wanting to move it. They needed it moved, so they say, hey, we want it moved. So they wanted to change the way it was before. And logically, they should pay for that. And my point is, in Quintain, they had to go to the status quo argument because there wasn't language in the lease or deed documents to look to. Don't you contend here that there is language? Yes. So we should go there first. Well, I think, yeah, if you go to paragraph 8 of the lease, it states that when you, let's say, installs a pipeline on the property, they have to bury it at a safe depth under any hall roads. That's what they determined in that lease. Now, of course, the definition we think of, what's a hall road? That would be up to a jury, in our opinion. But how would a judge instruct a jury to decide on disputed facts whether something is or is not a hall road? Well, one, you can take them out and let them look at it and see what you think. To me, a hall road is just a term that people are using. But if your argument, as I understand it, is that it's a factual question, then the judge's responsibility is to instruct the jury on the law applicable to the case. So how would a jury—I don't think you could do it by simply taking the jury out and looking at it and saying, do you think this is a hall road or not? You've got to do a little more than that, I think. Well, people can use their own common experience as to what's a road. It's like, for instance, in this case, we were trying to get this access to put a cellular tower up. This thing was delayed so long that we just put a new road in so they could haul these equipment up there and put it in. And it was put in there well before this judge issued this summary judgment decision. Didn't you say people can use their own common judgment of what's a hall road? I think they can. And that's what the court did. He based it on his own view of what a hall road was. Of what a hall road was. I don't think that's proper, Your Honor. Okay, and why not? Because I think that's, like I said, it's a jury thing. The jury's supposed to decide the facts, and I think that's a factual issue he's deciding. Well, the facts that support a conclusion as to whether or not certain facts fit within a definition, but as Judge Davis pointed out, you've got to give the jury some guidance as to what that means. And what about looking to regulations in West Virginia law that talk about roads used for mining or logging? I mean, there were two or three that I found that might suffice. They aren't specifically defined as hall roads, but I think that's just Judge Davis's point. There's got to be some limitation, some guidance, some direction in which to give to a jury. But I guess the more important point here is that the judge never got there because he found as a matter of law that he hadn't met your burden. I think that there's two ways to get at it as far as us prevailing. One would be if they went in and changed the status quo. If they did as we say they did, after we purchased, they went up and moved the pipeline and crossed over whatever it was, whether it was a path, then they changed the status quo and we would prevail. That was a factual issue. If the pipeline was there before we purchased it, then what you're raising is a valid issue. But I don't think it's a valid issue if, as a fact, it was moved. And it's our contention there's a factual issue that we did. The judge said it had never been moved, and I think that's clearly wrong and proven by the affidavit of Charles Hopkins. But even if it was moved, then if it was moved and there was never a haul road there to begin with, then how do you win? Well, I don't think you can go over something on somebody's property and move it that affects them, which it did in this case, and then expect us to pay for it. Going back to the who pays, did either party consider or address Paragraph 18 in the lease that talks about cost obligations, that the total cost shall include the cost of performing the obligations of Columbian contained in Paragraphs 8, which is the one you specifically addressed, and then it details there who's actually supposed to pay for what occurs in Paragraph 8? Did you address that at all? I don't recall, Your Honor. I see my time is growing short, and this is a small issue compared to the next one. Okay. I'd like to move on, if I could, to the DC-4 pipeline, which I think cost us $165,000, where this was just an issue of $45,000 we're talking about. Turning to that issue, I'm sure the Court is aware that well, let me give you some of the background that happened on this case. This was initially filed as a torch-to-land action. It was marked by EQT on the filing sheet that that's what they were filing. They did not mark the contract section. They filed a section or complaint with third count was that we had violated the status quo by placing dirt on their pipeline. We raised the issue of statute of limitations because we did not believe that we had placed any dirt or could have placed any dirt anywhere within two years of the date they filed this suit, which was on January 26th of 2009. The judge had us brief that issue, and we moved for summary judgment on that issue, and the judge denied our motion on the basis that they contended that on March 25th, 2007, we had placed dirt on their pipeline. We contended that that was not the case. They had no evidence to that. Well, thereafter, the judge instructs us to prepare instructions. We prepare our instructions. They prepare 22 of them. There's no contention that there's a contractual issue. It's all tort. Their verdict forms the same way. The time frame order which the court enters or the pretrial order which is entered on the day of the trial sets forth the fact that they say they will enter this lease into evidence perhaps. We object, stating that we object both to its admissibility and to its relevancy to the case. After they rest their case for the first time, and it's clear from their evidence that the last date that they could even prove that we might have put dirt on it was November 21, 2001, we again move for a directed verdict because on statute of limitations, they can say, well, our lease is a contract. Thereafter, after the case is concluded, the judge then instead of instructing the jury as to the law and what have you, he says, I'm just going to give several questions to the jury. You answer when they put the last dirt on it, and I'll decide the law. Well, about three months later, the judge decided the law. He goes back to the lease and says that that's a contract that count three sounds in contract, and therefore I'm going to . . . What was wrong with that process, that procedure? Well, the lease was never introduced into evidence by EQT at the trial. Well, there's no dispute that the lease existed, right? No, but this was a jury trial, and you would have to put it into evidence, wouldn't you? Well, but if the jury wasn't being asked to make a determination about the legal effect of the lease, why would it have been necessary to make it an exhibit before the jury? Well, think about it, Your Honor. If he had followed what was normal, I've never seen what he did here ever before in my life, and I've been practicing 46 years, is always the judge instructs them as to the law, and if he has any questions that they may apply it wrong, he gives them special interrogatories. But what's happened here, in my mind, is you can perceive that he looks and says, well, you left out part of your evidence here. I can't submit it to the jury. There's no way this jury under any instruction can find that they violated this lease because it's not even been introduced. So now he's going to inject himself into the trial to assist them. But I thought the jury's verdict simply required the judge to apply the law to the facts. The judge concluded that Paragraph 8 of the lease contained contractual undertakings. Isn't that the sum and substance of what the judge determined? He just says it's founded in contract. Right. I mean it's a contractual undertaking as to who pays, right? Correct. That's in the nature of it. That's what he's saying. Right. Let me say this. And the jury provided the factual basis for the virtual ministerial act of simply a – not that I don't mean that literally, of course, but basically the judge looked at the lease, looked at the jury's answers to the questions, and said there's only one rational conclusion here. Your Honor, I see my time's already expired on this. You can respond to it. You have a little time. Okay, yeah. Let me get into this. The judge still has to find that this act that they claim we committed, which was seven years before they filed their suit, fits within the ambit of West Virginia Code 5526, which requires a written contract between the parties. There was no contract between us. We never signed anything with these people. You're the successor in interest. No, we were not. To the signatories of the deed. That's not correct. It's not true? Island Creek still has all the rights related to that lease. They have never relinquished that. All we did was buy the surface subject to the rights of these outstanding easements. That's all we did. We signed nothing. And I'd like to point out to the Court, in the Sansom case, which I think is really relevant here in West Virginia, in that case there were three brothers and a mother who executed a lease to a United Fuel gas company. And in that lease it said that United Fuel could pay the money to one of the brothers who distributed out. Well, one of the brothers didn't do that. So the suit was brought 20 years after the fact. And the court was looking to say, well, how far can you go back? Can you go back ten or can you go back five? Well, the court there said only five years. They said even though all of them signed this thing, there was no written agreement between the parties to allow a ten-year statute of limitations. The court held there was just merely an implied contract as a result of this thing and applied that accordingly. And so they only let them go back five years. So what we're contending here, the best there could be is an implied contract,  Thank you, Your Honor. Thank you very much, Mr. Partain. We'll hear further from you in your rebuttal. Yes, sir. Mr. Hendrickson, we'll be glad to hear from you, sir. Thank you. I hope I won't lose that notebook there. Good morning. My name is Dave Hendrickson along with Steve Hastings. We represent EQT. I'm an attorney from Charleston, West Virginia. Basically, Your Honors, this is a pretty simple proposition. We had two different pipelines on the same piece of property where we had an easement arising out of the same lease. And what the lease provision said in paragraph 8 was was that all pipelines except those used to conduct gas and water for the drilling engine shall be buried below plowed depth and cultivated and at a safe depth when crossing under railroads, highways, or haul roads. The issue here is twofold. Under the first motion, where the judge granted summary judgment, what the judge found was it didn't, there wasn't a haul road. And there's a very good reason why he found that way. First of all, all the evidence presented underneath to the judge, to Judge Copenhaver, was that what the pathway they were crossing hadn't been used as a haul road forever or was ever used as a haul road. What happened was... What's your definition of a haul road? Well, we cited in our brief, Your Honor, the West Virginia Division of Environmental Protection for Mining and Reclamation, and they define haul roads as haul roads where there's a right-of-way for vehicles to travel over for hauling coal and timber. These roads had never been used, this path had never been used for that. And the facts, if I could back up for a second and explain my position, what happened was, the reason we got into this dispute was the mall company wanted to put a cell tower on top of the mountain. Okay? Our pipeline, we contend, had been in place, the one at issue in this first motion, since 97 or 98. Judge Copenhaver, in weighing all the evidence, took it in the light most favorable to the defendants and said, well, I'm going to find they were in place by at least 2001. By the way, was that a... I don't mean to interrupt, but was that a finding or was that a conclusion of law based on summary judgment standard? It was a finding that the judge, based on summary judgment standard. Okay, so you don't make findings in summary judgment. Correct. Right? Correct. And so, your point is, when the district court considered everything that was before the court, only one reasonable conclusion was possible. Correct. And that is that at least by 2001... The pipeline was crossed that path. Okay. And so, the pipeline remains undisturbed through 2001 through 2008. It doesn't become an issue until 2008 when they want to put a cell tower up on the mountain. And they brought excavators up to try to cut underneath the pipeline and it dangled almost 12 feet in the air. And we asked them to stop. We sought an injunction because we were afraid of somebody, quite frankly, blowing themselves up. So, what happened between 2001 and 2008 was the evidence was nobody used that road. And the only other evidence presented about the little pathway was that it might have been used by the gas company when they drilled and also if they had to transport pipe back up the hill. But it wasn't being used as a haul road as was contemplated by the original lease, and the original lease contemplated the moving of coal and timber. And this was never used as a haul road under that definition. So, Judge Copen... The haul road wasn't actually defined in the original lease, was it? Well, if you look at... Good question. It doesn't define it per se, but what the original lease was between a coal company and what they did was they reserved the right to take the coal and timber off the property. And so that's why this clause was in there, so that the pipeline wouldn't run across the road they're using to haul coal and timber off the property. That's why I'm saying it was defined that way. The second point on number one, if I could, unless there's other questions on point one, is that Quintain is right on point. Quintain says when you violate the status quo, which they did when they put their dozer up there and started cutting underneath the pipeline, then it became a dangerous situation and we would have to move the pipeline if they wanted us to if they wanted to continue to cut the road. And so we said, look, we're willing to move our pipeline if you'll pay for it. But before, in Quintain, before we get to the status quo considerations, if there is a lease or other contractual document, don't we look to it first in terms of cost obligations? Absolutely. OK, so I asked Mr. Partain, and he couldn't help me, and maybe you can. I have the answer to that question. Oh, great, because it looks like Paragraph 18 does discuss, in some part, who is to pay for the contractual undertakings contained in Paragraph 8. Does it or does it not? Paragraph 18, Your Honor, refers to simply when you first place the pipeline on the ground. It would be our cost to pay for that pipeline to be placed. And then Quintain, what it does is it goes to the violation of the status quo of the easement. So the original cost of putting the pipeline in place is clearly our obligation. And how do you get to your interpretation of Paragraph 18 as referencing only when the pipeline is very first put into place? When you read the totality of the lease,  at least I believe it becomes clear, Your Honor, that it talks about the original placement of the pipeline. Was this something that the district court considered at all, Paragraph 18 and its interplay with Paragraph 8? I don't think so. I didn't see it. Yeah, I don't think so. Judge Copenhaver is a very careful jurist, as you all know, but I don't think he considered that in conjunction with Paragraph 8. But the second point that I wanted to make, if I may, Your Honor, is under Quintain, then, you have to look whether or not there's a cost-shifting paragraph in the lease. And clearly, what the defendants are relying on about placement under a haul road isn't a cost-shifting provision. So even if the district court was wrong, even if he was wrong that it is a haul road, they still have to pay for the relocation because it's a change of the status quo. And it's very simple in why the court found that before in Quintain. We don't benefit by moving the pipeline. We're happy to have it right where it is. It could stay there for the next 30 years. The only one that benefited from us moving the pipeline was the defendant, and the reason they benefited from it was because they wanted us to move it so they could put a cell tower on top of the hill. This is a rule of equity? It is. Any other questions on the first one? I'll move on to the second one. The second one is the facts. I think I need to bear out with you a little bit, if you don't mind. What happened was on the second one was we had a second pipeline that was down next to where they're developing a mall called the Fountain Place Mall. The pipeline had been moved once before at the request of the mall owners, and they paid for the relocation. It wasn't this defendant, but it was their predecessor. We moved the pipeline, and what happened, dirt was once again placed on top of the pipeline, which, as you well know, could very well hurt the integrity of the pipeline and cause explosions and trouble. We asked them to cease and desist. We got into negotiations on who was going to move the pipeline. We eventually just said, heck, we're going to go ahead and do it ourselves, and we'll fight about who's going to pay for it later, and that's what we did, and that's where we came up with the $158,000 in damages that it was stipulated to. We filed our lawsuit. We bring in three claims. Negligence, trespass, and status quo under Quintain. The court then, we go along, we develop the evidence. The court at the pretrial conference says, because the defendant raised it for the first time, I need a brief on this issue about statute of limitations, and David, me, I want you to respond to it.  We responded to that brief by saying, we didn't think the two-year statute of limitations applied to what, in his instance, because of the fact that it was a reoccurring tort, or a continuing tort. Judge Copenhaver ruled on that issue and told me, told us, that at trial, we couldn't argue the fact about it being a continuing tort. He was ruling as a matter of law. That didn't count. But what he did then, though, and if you look at what happened, the judge fashioned a trial that simply asked the jury to determine these things. Who placed dirt on the line? When was the last time they placed dirt on the line? And when did my client know, or should have known, that they placed dirt on the line? Clearly, to set up the issue of statute of limitations, or what statute of limitations should apply. And the judge made it very clear that after the jury rendered their verdict on those questions, he would make his decision and apply the statute of limitations law. So the jury went out, and the jury found that the defendant's predecessor placed dirt on the line in the date, and when we should have known it. They found that the defendant placed dirt on the line in the date, last date they did it, and when we should have known it. And then they made a decision as to what of three torts, remained. One was in negligence, one was in trespass, and one was status quo. They found against my client on negligence, but found for my client on the tort of trespass, and on the contractual thing of status quo. And all that's reflected in the verdict sheet. Yes, sir. Yes, Your Honor. I'm sorry. Yes, Your Honor. And so, after that fact, the judge then said, I'm going to ask you to brief the issues of statute of limitations. And we did. We did, and the defendant did. And we raised the ten-year statute of limitations. And the damages have been stipulated. Damages have been stipulated. So then all the court has to do is determine whether or not our case stands or falls based on the statute of limitations. And what the court ruled, consistent with their earlier ruling was, our trespass count went out the door because of the two-year statute for tort. The court did say, though, that Quintain is clearly a contractual cause of action. And it's pretty simple. In Quintain, all of the cause of action arose out of the lease. And you don't have to be the original signatories to the contract because your easement rights continue no matter who owns the property. We can sell our lease to another gas production company they still get to enjoy the rights of the easement they have on the property. Mr. Partain's client, Fountain Place, can sell the surface rights, but it's still subject to our easement, clearly a contractual obligation. And when he violated the status quo, it violated our contractual rights under Quintain and the ten-year statute of limitations apply. And that's how Judge Copenhaver rendered his decision because the jury found that Mr. Partain's client placed dirt on our pipeline in 2001. We should have known by 2001 that it did so. We brought our cause of action in 2009 within the ten-year statute of limitations. Questions? You make it all seem so simple. Thank you. I wish it was. Not as much as we do. Anything else? Okay. Thank you very much. Appreciate it. Your Honor, I think one of the most definitive ways that we can define whether or not these were haul roads or whether they considered them haul roads would be just look to what EQT's counsel said. Now, when the judge asked us to enter into a stipulation as to this BR-886 pipeline, there is Exhibit 19, and attached to that is a letter from Mr. Hendrickson. And in that, if you can look at that letter, it's at pages 230 and 231 of the appendix, it clearly describes these are haul roads. He references them continuously as haul roads. So they're referencing them as haul roads at all times in the correspondence, and they even stipulate that there's an issue of fact as to that, and yet we're supposed to lose that. It's not an issue of fact. As far as the DC-4 pipeline is concerned, and attempting to address this paragraph 18, which is, as you know, about two pages long, is Island Creek Coal Company made this lease. Island Creek Coal Company still owns all the rights. Everything in that lease was directed to them. They prepared that lease, and they have the rights. And so we didn't get any rights under that lease. All that happened there was that Island Creek at some point in 1965 sold this property to Georgia Pacific, who in turn sold it to Montero Development Corporation, who sold it to Montero Marketplace, bankrupt, and then we bought it out of the bankruptcy. So all I can say is I still think that it's at best an implied contract because we did not sign anything. Contracts have mutual obligations going to each other, and I think if you look at 55-2-6, you'll see that it requires a written agreement between the parties, and that's what the Supreme Court of West Virginia held in the Sansom v. Sansom case. Thank you, Your Honor. Thank you very much, Mr. Partain. We appreciate counsel's arguments. We'll go down and greet counsel and proceed to our third case.
judges: Andre M. Davis, Albert Diaz, Stephanie D. Thacker